# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMY L. COOK, | ) | |
| Plaintiff, | ) | |
|  | ) | |
|  | ) | |
| v. | ) | **CIVIL ACTION** |
|  | ) | **NO. 14-40112-DHH** |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |
|  | ) | |

## <u>ORDER</u>

### March 27, 2017

Hennessy, M.J.

The Plaintiff, Amy L. Cook, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2]  (Docket #11).  The Commissioner seeks an order affirming her decision.  (Docket #21).

For the reasons that follow, Cook's Motion to Remand (Docket #11) is DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #21) is ALLOWED.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy Berryhill is substituted for Carolyn W. Colvin, as the Acting Commissioner of the Social Security Administration as of January 23, 2017.

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

I.      BACKGROUND

A.      Procedural History

Cook filed an application for DIB on July 9, 2009, and an application for SSI on August 5, 2009, alleging in both that she had been disabled since August 8, 2008.  (Tr. 324-37).   The applications were denied initially and upon reconsideration.  (Tr. 159-62).   Cook requested a hearing on October 1, 2010 (Tr. 210-11), and a hearing was held before an Administrative Law Judge ("ALJ") on December 5, 2011, (Tr. 80-120).  On January 27, 2012, the ALJ issued a decision finding that Cook was not disabled.  (Tr. 163-82).  Cook requested a review of the decision by the Appeals Council.  (Tr. 258-60).

By order dated April 23, 2013, the Appeals Council vacated the ALJ's decision and remanded Cook's claim for further consideration.  (Tr. 183-86).  Specifically, the Appeals Council asked the ALJ to resolve two issues.  First, the Appeals Council noted that the ALJ found that Cook had severe impairments of depression and post-traumatic stress disorder, resulting in mild to moderate difficulties in maintaining social functioning; however, the RFC contained no description of the mental functions that Cook could still perform despite these social limitations. (Tr. 184).  The Appeals Council stated that such findings required an accompanying mental limitation.  (Id.).  Secondly, the Appeals Council stated that, in light of the ALJ's finding that Cook's cataracts, status-post-repair, were a severe impairment, the decision required the ALJ to discuss what, if any, visual limitations Cook continued to suffer as a result of her cataracts after surgical repair.  (Id.).  The ALJ failed to include this in his decision.  (Id.).

On November 13, 2013, the ALJ held another hearing.  (Tr. 41-79).  In a decision dated November 15, 2013, the ALJ again found Cook not disabled.  (Tr. 22-40).  Cook requested review of this decision on December 6, 2013. (Tr. 19-21).  On June 30, 2014, the Appeals Council denied her request for review, making the ALJ's November 13, 2013 decision final and ripe for judicial

2

review.  (Tr. 1-3).  Having timely pursued and exhausted her administrative remedies before the Commissioner, Cook filed a complaint in this Court on August 15, 2014, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  Cook filed the motion for reversal or remand on January 30, 2015, (Docket #11), and the Commissioner filed a cross-motion on May 14, 2015, (Docket #21).

B.     Personal History

At the time she claims she became disabled, Cook was forty-four years old.  (Tr. 324). Cook is a high school graduate and completed two years of college, graduating with an Associate's Degree in Science.  (Tr. 84-85).  She has no past relevant work.  (Tr. 56).  Cook has a driver's license and lives in an apartment with her boyfriend.  (Tr. 47, 94, 553).

C.     Medical History

On December 22, 2008, Cook was seen by Dr. Trister for complaints related to hypothyroidism, shortness of breath, coughing, fatigue, wheezing, and tobacco dependence.[3]  (Tr. 544).  Trister noted that Cook had diabetes and was depressed.  (Id.).  Trister stated that Cook's behavior was adequate and she was emotionally stable.  (Id.).  Trister diagnosed Cook with hypothyroidism and chronic obstructive pulmonary disease ("COPD") and counseled Cook regarding her tobacco use and diet.[4]  (Tr. 545).  At a follow-up visit on May 1, 2009, Cook complained of episodes of blurred vision lasting twenty to thirty minutes.  (Tr. 538).  Physical examination revealed painful joints and bilateral expiratory wheezes.  (Id.).  Dr. Trister again noted that Cook's behavior was adequate and she was emotionally stable.  (Id.).  Cook returned for a follow-up on June 15, 2009, where Dr. Trister noted poor compliance with medical recommendations.  (Tr. 533).  At a July 7, 2009 follow-up visit, Cook complained of pain in

---

[3] Dr. Trister first started treating Cook on October 3, 2002.  (Tr. 813).

[4] Cook continued to use tobacco throughout her treatment relationship with Dr. Trister.  (Tr. 127, 544).

multiple joints, stiffness, myalgia, limited range of motion, blurred vision, depressed mood, anhedonia, poor appetite and sleep, fatigue, restlessness, irritability, difficulty in concentrating, poor memory and an inability to make decisions. (Tr. 531). Dr. Trister noted that Cook was obese and diagnosed her with hypothyroidism, COPD, vision change, and depression. (Tr. 531-32).

On October 7, 2009, Dr. Moss, Cook's ophthalmologist, stated that Cook had a cataract first diagnosed on June 17, 2009, and that he expected a good prognosis for restoring vision with a planned cataract surgery. (Tr. 557-59).

On November 4, 2009, Cook returned to Dr. Trister complaining of chronic fatigue, weakness, lack of energy, poor concentration and motivation, weight gain, hair loss, frequent colds, depressed mood, insomnia, and an unstable appetite. (Tr. 603). Her diagnoses remained unchanged. (Tr. 604).

On November 29, 2009, Cook fell as she was coming out of her bedroom; however, she was able to get up. (Tr. 624). After twenty-four hours, she noted some unsteadiness. (Id.). By December 1, 2009, she noted a feeling of weakness involving the left arm and leg with dragging of her left foot and some numbness over the left side of her face. (Id.). She was then seen at UMass Medical Center and sent home after examination. (Id.). Dr. Trister later characterized this episode as a transient ischemic attack ("TIA"). (Tr. 649). On that date, a CT of her head was taken revealing a normal exam. (Tr. 594). A CT angiography of her neck and head also taken on that date was unremarkable. (Tr. 595).

On December 2, 2009, an MRI of Cook's brain was performed due to her complaints of left-sided weakness, right-sided sensory loss, headaches, and gait instability. (Tr. 590). The MRI revealed no acute intracranial abnormality but mild nonspecific increased T2 signal foci in the cerebral white matter and a possible small posterior fossa arachnoid cyst in the retrocerebellar

location.  (Tr. 591).  Differential diagnoses included migraine headaches, chronic small vessel ischemic change, and mild demyelinating or inflammatory process.  (Id.).  A cervical MRI was also performed on the same day due to Cook's gait instability.  (Tr. 592).  The imaging revealed no acute abnormality or evidence of cord compression.  (Tr. 593).  The imaging did show mild spondylotic changes, most prominent at the C4-C5 and C5-C6 levels with mild to moderate left neural foraminal stenosis.  (Id.).

On December 8, 2009, Dr. Och, a psychiatrist, composed a narrative report stating that Cook suffered from major depressive disorder with psychotic features.  (Tr. 702).  Cook had been under Dr. Och's care since August 11, 2009.[5]  (Tr. 826).  Dr. Och stated that Cook had a sad mood, depressed affect, poor energy, experienced hallucinations, and suffered from poor sleep.  (Tr. 702).  Dr. Och opined that these symptoms interfered with Cook's functioning and rendered her unable to do any type of work for at least one year.  (Id.).

Pursuant to orders by Dr. Trister, a brain/head MRI was performed on December 11, 2009.  (Tr. 583, 650).  The results were normal.  (Tr. 585, 647).  At her follow-up appointment with Dr. Trister on that date, Cook complained of no improvement in her dizziness and continued left side weakness and numbness.  (Tr. 647).

On December 16, 2009, Dr. Savla, a neurologist, examined Cook.  (Tr. 588).  Physical examination revealed mild left pronator drift, slightly slurred speech, slow gait, and some circumduction of the left leg.  (Id.).  Cook could extend her leg up to thirty degrees and had upgoing toes on the left side.  (Id.).  Dr. Savla diagnosed right cerebro-vascular accident ("CVA") (stroke)

---

[5] In most instances, Dr. Och's notes prior to February 16, 2010, which are handwritten, are illegible, preventing a detailed summary here of his findings prior to that date.

with left hemiparesis. (Tr. 588). Dr. Savla opined that the etiology of the stroke was hypertension and prescribed one baby aspirin daily. (Tr. 599).

On February 16, 2010, Cook reported to Dr. Och that she was "not too bad," reporting that she had woken up twice with hallucinations and nightmares of childhood events.[6] (Tr. 793).

Cook followed up with Dr. Trister on February 25, 2010 complaining of continued dizziness, occipital headache, fatigue, and poor concentration. (Tr. 632). An occipital nerve block was administered using Lidocaine and Kenalog. (Tr. 632-33).

On April 6, 2010, Dr. Och composed a subsequent narrative report. (Tr. 826). Dr. Och stated that he had treated Cook since August 11, 2009 for depression and anxiety as well as hallucinations. (Id.). Dr. Och reported that Cook's mood had improved with medication but psychotic symptoms continued. (Id.). He opined that Cook was "totally and permanently disabled" at this time. (Id.).

Cook followed-up with Dr. Och on April 7, 2010. (Tr. 792). Dr. Och noted that Cook's hallucinations were improved overall and that her depression was "under good control." (Id.).

On April 15, 2010, Dr. Och completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. 838-45). Dr. Och diagnosed Cook with major depressive disorder with psychotic features and a global assessment of functioning ("GAF") score of 50.[7] (Tr. 838). Dr. Och indicated that Cook's psychiatric condition would exacerbate her chronic pain issues. (Tr. 844). Dr. Och stated that Cook's impairments would last at least twelve months and that she was not a malingerer. (Id.). Dr. Och opined that Cook's prognosis was fair. (Tr. 838). Clinical

[6] A handwritten treatment note from Cook's March 2, 2010 appointment with Dr. Och is mostly illegible, and, therefore, will not be discussed here. (Tr. 827).

[7] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000). A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning. Id.

findings included poor memory; appetite disturbance with weight change; sleep disturbance; mood disturbance; emotional liability; hallucinations; recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; social withdrawal or isolation; blunt, flat, or inappropriate affect; decreased energy; and generalized persistent anxiety.  (Tr. 839).  Dr. Och noted that Cook's primary symptoms were a depressed mood, visual hallucinations, and anxiety with her depression and anxiety being the most severe.  (Tr. 840).  Dr. Och stated that Cook was markedly limited, defined as effectively precluded, in the following abilities:  remember location and work-like procedures; understand and remember one or two-step instructions; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; awareness of normal hazards and taking of appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently.  (Tr. 841-43).  Dr. Och stated that Cook was moderately limited, defined as significantly affected, but not totally precluded, in the following abilities:  carry out simple one or two-step instructions; sustain ordinary routine without supervision; make simple work related decisions; interact appropriately with the general public; ask simple questions or request

7

assistance; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Id.). Dr. Och concluded that Cook was incapable of even "low stress" in the workplace, and that she would be absent from work more than three times a month as a result of her impairments. (Tr. 844-45).

On May 11, 2010, Dr. Och stated that Cook was "[d]oing well" and "[s]table with meds." (Tr. 791). Cook reported that her sleep was "good" and that her auditory hallucinations had decreased. (Id.). On June 7, 2010, Cook stated that she was doing "OK" except for some visual hallucinations. (Tr. 790). Dr. Och adjusted her medication in response. (Id.).

On June 8, 2010, Dr. Trister completed a Multiple Impairment Questionnaire.[8] (Tr. 812-20). Dr. Trister diagnosed Cook with hypertension, hypothyroidism, depression, anxiety, hyperlipidemia, dizziness, chronic back and neck pain, diffuse myalgia, and bilateral cataracts. (Tr. 813). Dr. Trister rated Cook's prognosis as fair. (Id.). Dr. Trister stated that Cook was chronically fatigued, weak, depressed, and anxious, and had intermittent moderate-to-severe dizziness which affected her activities of daily living. (Id.). Her primary symptoms were chronic diffused pain in her shoulders, mid back, lower back, and legs, depression, anxiety, fatigue, and insomnia due to pain and depression. (Tr. 814). Dr. Trister observed that Cook's pain was constant and rated it an eight to nine on a scale of ten. (Tr. 814-15). Dr. Trister opined that, in an eight-hour day, Cook could, in total, sit for less than one hour and stand/walk for less than one hour. (Tr. 815). Dr. Trister stated that Cook would need to get up and move around every ten minutes for a five to ten minute period. (Tr. 815-16). Dr. Trister further opined that Cook could only occasionally lift or carry up to five pounds and had significant limitations in doing repetitive

---

[8] While the Multiple Impairment Questionnaire is dated June 8, 2010, (Tr. 820), it states that the date of Dr. Trister's most recent examination of Cook is June 9, 2010, (Tr. 813). Any discrepancy in these dates is immaterial to my decision.

reaching, handling, fingering, or lifting.  (Tr. 816).  He concluded that Cook had marked limitations in using her upper extremities that essentially precluding her from using them in a competitive eight-hour work day.  (Tr. 816-17).  Dr. Trister opined that Cook's symptoms would constantly interfere with her attention and concentration, she was incapable of even low work stress, and was likely to be absent from work due to her conditions more than three times a month.  (Tr. 818-19). Stating that she was not a malingerer, Dr. Trister concluded that Cook was unable to work.  (Tr. 818).

At a June 9, 2010 appointment with Dr. Trister, Cook reported a depressed mood and insomnia, complaining of a lack of motivation, fatigue, and weakness.  (Tr. 725).  With respect to her complaints of depression, Dr. Trister found that "[o]verall, patient is stable at present."  (Id.). Cook also reported widespread pain, stiffness, irritability, and nonrestorative sleep.  (Id.).  Physical examination revealed multiple tender muscular, musculotendinous, capsular, and ligamentous points.  (Id.).  Dr. Trister diagnosed hypothyroidism, depression, and myofascial pain syndrome. (Tr. 726).  That same day, Dr. Trister filled out a form provided by Cook as part of an application for State welfare benefits in which he indicated that Cook had multiple joints pain, which he did not expect would improve, as well as depression, anxiety, hypothyroidism, hypertension, and cataract.  (Tr. 713-21).  With respect to Cook's mental impairments, Dr. Trister noted that her appearance, attitude, behavior, orientation, speech, thought process, and cognition were all normal and that she had not experienced hallucinations.  (Tr. 718).  Dr. Trister stated that Cook had a depressed mood and affect.  (Id.).  Dr. Trister indicated that Cook's impairments affected her ability to work.  (Tr. 721).  Also on that date, Dr. Trister wrote a letter opining that Cook was totally disabled.  (Tr. 795-96).

At a follow-up appointment with Dr. Och on July 13, 2010, Cook stated that she was "OK" but was still experiencing visual hallucinations. (Tr. 789). Dr. Och again adjusted Cook's medications. (Id.).

On July 30, 2010, Dr. Trister completed a Neurological Disorder form in which he observed that Cook used a walker for balance and had a slow and unsteady gait. (Tr. 724). Dr. Trister stated that Cook had no persistent motor dysfunction in her upper extremities and only mild persistent motor dysfunction in her lower extremities. (Id.). No visual, auditory, or speech changes were detected. (Id.). Dr. Trister offered a fair prognosis. (Id.).

On August 11, 2010, Dr. Och noted that Cook's mood was stable and her anxiety was under control although issues remained with respect to her sleep. (Tr. 788).

Cook followed-up with Dr. Trister on September 1, 2010. (Tr. 805). Dr. Trister stated that Cook's depression was stable at present with no complaints and that she was suffering no adverse effect from her medications. (Id.). Dr. Trister also noted that Cook's hypothyroidism was stable at present and that she was tolerating therapy well and that control of her hypertension was adequate. (Id.).

On September 15, 2011, Cook had a visit with Dr. Och after having moved to Florida and back with her boyfriend. (Tr. 787). Cook reported that she was forgetful and still experienced auditory hallucinations and nightmares. (Id.). Dr. Och reported that Cook appeared to be in a good mood, and was pleasant although she was stressed. (Id.).

On September 20, 2011, Dr. Trister found that Cook's hypothyroidism was stable and noted that, with respect to her hypertension, Cook reported feeling well. (Tr. 798). While Cook complained of a lack of motivation, fatigue, and weakness, Dr. Trister stated that her depression

was stable and noted that Cook had reported that her medications had been somewhat effective. (Id.).

At a follow-up appointment on September 29, 2011, Dr. Och reported that Cook was "doing well" and had no issues with her medications.  (Tr. 786).

On October 25, 2011, Dr. Och stated that Cook "[s]eems better [w]ith no acute psychosis" and was "less depressed" but did have one incident of hallucinations.  (Tr. 860).  Dr. Och increased Cook's dosage of Prozac and Abilify.  (Id.).

Later that day, Cook returned to Dr. Trister complaining of a cough, sneezing, headache, chills, and myalgia.  (Tr. 127).  Dr. Trister again noted, that with respect to her hypertension, Cook reported feeling well, and that the current therapy for Cook's hypothyroidism was effective.  (Id.). Dr. Trister observed that Cook's mood was "ok."  (Id.).

On November 22, 2011, Dr. Och noted that Cook was "[g]reatly improved," okay on her medications, and was "no longer psychotic."  (Tr. 859).  On December 20, 2011, Dr. Och observed that, except for a cold, Cook was otherwise okay and had no issues with her medication.  (Id.).

Dr. Och again completed a Psychiatric/Psychological Impairment Questionnaire on January 2, 2012.  (Tr. 850-57).  His diagnosis and prognosis were unchanged from the prior questionnaire.  (Tr. 850).  Dr. Och expanded his clinical findings to also include perceptual disturbances and somatization unexplained by organic disturbance.  (Tr. 851).  Cook's limitations were unchanged except for her abilities to carry out simple one or two-step instructions and to interact appropriately with the general public, both of which had worsened from moderately limited to markedly limited.  (Tr. 853-55).  Dr. Och also reported that Cook suffered from episodes of deterioration or decompensation in work or work like settings which caused her to withdraw from that situation and/or experience exacerbation of signs and symptoms as evidenced by her

frequent recurrence of hallucinations.  (Tr. 855).  Dr. Och once again opined that Cook was incapable of even "Low stress" in the workplace, and that, on average, she would be absent from work due to her impairments more than three times a month.  (Tr. 856-57).

On January 26, 2012, Dr. Trister composed a narrative report stating that the Multiple Impairment Questionnaire completed on June 8, 2010 remained an accurate and valid representation of his opinion of Cook's ongoing condition.  (Tr. 863).

At a visit with Dr. Och on January 30, 2012, Cook reported that she was experiencing insomnia and hallucinations.  (Tr. 868).  In response, Dr. Och adjusted Cook's medications.  (Id.). On February 13, 2012, Cook reported to Dr. Och that her sleep was better but she still had rare auditory hallucinations.  (Tr. 867).  On March 15, 2012, Cook reported that she was "doing well," slept better, and had no hallucinations.  (Tr. 866).

On April 30, 2012, Dr. Och composed a narrative report in which he diagnosed Cook with Recurrent Major Depression with psychosis and anxiety.  (Tr. 865).  Dr. Och stated that Cook had a fair response to her medications with decreased symptoms.  (Id.).  Dr. Och observed that Cook had severe limitations in activity and was able to do only minimal activities of daily living.  (Id.). Dr. Och opined that Cook's prognosis was fair and that she was permanently and totally disabled. (Id.).

On May 17, 2012, Cook reported to Dr. Och that she had been doing "OK" although she was missing Florida and was dealing with stress.  (Tr. 887).  Dr. Och continued Cook on her medication regiment noting that she suffered no present psychosis.  (Id.).  On August 1, 2012, Cook reported a recurrence of auditory and visual hallucinations.  (Tr. 886).  Dr. Och adjusted Cook's medication and noted that her prognosis was poor.  (Id.).  At a follow-up appointment on February 19, 2013, Dr. Och stated that Cook's prognosis continued to be poor.  (Tr. 884).  Cook

reported that she continued to suffer from hallucinations.  (Id.).  Dr. Och, noting that, as of yet, Cook had failed to have a good response to antipsychotic medications, prescribed a trial of Latuda along with Prozac.  (Tr. 885).  On March 20, 2013, Dr. Och observed that Cook was improved on the Latuda, which seemed to be working better than any other antipsychotic medication so far. (Tr. 883).  At a follow-up appointment on April 17, 2013, Cook reported that she had not had any visual hallucinations but continued to experience minimal auditory hallucinations.  (Tr. 882).  Dr. Och stated that Cook's psychotic symptoms were "much better."  (Id.).  On June 12, 2013, Dr. Och observed that Cook was doing well and "[m]uch more stable" and had only "[v]ery rare" psychotic symptoms.  (Tr. 881).

Following an examination of Cook in May 2013, Dr. Trister composed an updated narrative report on June 14, 2013.  (Tr. 869-70).  Her reported that, over the course of her treatment, Cook had complained of chronic fatigue, weakness, insomnia, depression, and anxiety.  (Tr. 869).  Dr. Trister also stated that Cook suffers from chronic, diffuse back, neck, shoulder, and leg pain; moderate to severe dizziness; and myofascial pain syndrome with diffuse myalgias which affect her activities of daily living and prevent gainful employment.  (Id.).  Dr. Trister diagnosed Cook with chronic myofascial pain syndrome, hypertension, hypothyroidism, hyperlipidemia, dizziness, chronic back and neck pain, bilateral cataracts, depression, and anxiety.  (Id.).  Dr. Trister stated that, "[d]espite continued treatment and medication management Ms. Cook remains symptomatic," and that the functional limitations he opined to in the Multiple Impairment Questionnaire completed on June 8, 2010, remained valid.  (Tr. 870).  In Dr. Trister's medical opinion, Cook had "been unable to perform any kind of competitive work on a sustained basis since at least 2009," and, "[g]iven the multitude, severity, and chronic nature of her conditions, Ms. Cook's ability to recover enough to return to competitive work remains improbable."  (Id.).

On June 19, 2013, Dr. Och composed a narrative report stating that, in his medical opinion, Cook "remained psychiatrically disabled and unable to sustain the requirements of full-time, competitive work since at least August 2009," the date she initially presented to Dr. Och.  (Tr. 872).

D.    Consultative Psychological Examination

On September 22, 2009, Dr. Campbell, a consultative psychologist, completed a psychological examination of Cook.  (Tr. 551-54).  Cook responded to Dr. Campbell's questions directly and clearly although most questions were responded to with short answers which revealed little about her.  (Tr. 551-52).  Cook indicated that she needed medication to sleep.  (Tr. 552).  She reported daily five-to-ten minute episodes of intense anxiety with symptoms including a pounding heart, difficulty breathing, sweating, shaking, nausea, and the need to leave wherever she is at the time.  (Id.).  Cook stated that these episodes were made worse by too much stimulation so she isolated herself in order to control them.  (Id.).  She also indicated that medication helped with the episodes.  (Id.).  Cook scored a thirty out of thirty on the Mini-Mental State Exam.  (Id.).

Dr. Campbell diagnosed Cook with panic disorder with agoraphobia and depressive disorder and assessed her with a GAF score of 55.[9]  (Tr. 553-54).  Dr. Campbell observed that Cook did not appear to have any major formal cognitive defects, experienced considerable anxiety, had few interpersonal skills, and was able to focus, concentrate, and learn new material in a minimally stressful environment.  (Tr. 554).

---

[9] A GAF score in the 51-60 range indicates "moderate" (and not serious) symptoms or difficulty in social and occupational functioning.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

E.      State Agency Opinions

1. Physical

On November 18, 2009, Dr. Karande, a state agency medical consultant, reviewed the evidence of record and opined that Cook had no severe physical impairments.  (Tr. 563).

Dr. Purins, a state agency medical consultant, reviewed Cook's record and completed a Physical Residual Functional Capacity form on July 27, 2010.  (Tr. 763-70).  Dr. Purins opined that Cook could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk for at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday, and should avoid concentrated exposure to extreme cold and heat and hazards. (Tr. 764, 767).  Dr. Purins further opined that Cook should only occasionally climb, balance, stoop, kneel, crouch, or crawl.  (Tr. 765).

2. Mental

On November 20, 2009, Dr. O'Sullivan, a state agency psychological consultant, completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique assessing Cook.  (Tr. 564-81).  Dr. O'Sullivan opined that Cook had severe affective disorders and anxiety-related disorders.  (Tr. 566).  Dr. O'Sullivan stated that Cook could learn and remember simple, routine, and somewhat detailed instructions, may need occasional brief breaks to manage anxiety, could perform simple, routine tasks at an average pace over a regular full-time routine, would do best in uncrowded settings, may be withdrawn from co-workers, could be socially effective, and could adapt effectively.  (Tr. 566).

F.      Hearing Testimony

A hearing before an ALJ was held on December 5, 2011, where Cook, represented by an attorney, and a vocational expert gave testimony.  (Tr. 80-120).  Cook testified that the last job she

had was as a certified nurse assistant in July and August of 2008 but that, in the past fifteen years, she had not had a job that lasted more than five months.  (Tr. 83, 90).  She stated that she had a driver's license and occasionally drove.  (Tr. 94).  Cook testified that she was trying to quit smoking and currently smoked five cigarettes a day.  (Tr. 112).

Cook testified that many of her physical problems began following a car accident in 2006.  (Tr. 85-86).  Cook stated that she experienced constant pain in her shoulder, mainly on the left side; neck; and back.  (Tr. 93, 108).  She stated that this pain prevented her from sitting for long periods of time, no more than a half-hour to an hour, and from lifting, remarking that it was painful just to do the dishes.  (Tr. 93, 99).  Cook stated that she could stand in one spot comfortably for approximately ten minutes, sit for five to ten minutes, and that walking was painful.  (Tr. 106).  She testified that she would either move positions or lay down when experiencing pain.  (Tr. 107).  Cook stated that she used no assistive device to get around.  (Tr. 94).  She testified that was able to walk the six blocks from her home to the hearing, although she stopped a couple of times on the way.[10]  (Id.).

Cook testified that, in response to any kind of stress, she gets fraught with anxiety, causing her to lose concentration.  (Tr. 99-100).  To treat her anxiety, she takes Lorazepam three times daily, which she stated made her drowsy.  (Tr. 97-98, 100, 104-05).  Cook also stated that she doesn't work well around people in general, and had difficulties with her supervisors.  (Tr. 100, 112-13).  Cook testified that, while psychiatric treatment had reduce episodes of hallucinations somewhat, her anxiety and depression had not been alleviated.  (Tr. 104).  She stated that her depression caused her to have a hard time getting out of bed every day.  (Tr. 108-09).

---

[10] At the hearing, the ALJ utilized Mapquest to determine that Cook's home was .94 miles from the site of the hearing. (Tr. 96).

Cook moved to Florida earlier that year for a period of eight months with her boyfriend. (Tr. 90). Cook testified that she lived in various parts of the state in a camper. (Id.). Cook denied having any hobbies or participating in any activities beyond reading the newspaper or watching television. (Tr. 109). She stated that she did not socialize much beyond her boyfriend and daughters. (Id.).

On November 13, 2013, a second hearing before the same ALJ was held. (Tr. 41-79). Cook, represented by an attorney, and a vocational expert gave testimony. (Id.). Cook testified that she had moved since the last hearing and remained in her relationship. (Tr. 45, 47).

Cook reiterated that she had difficulty working around other people, stating that she generally does not get along with anyone. (Tr. 47). She confirmed that she was able to travel in public, although she stated that she was uncomfortable going places unless accompanied by her boyfriend or daughter. (Tr. 47-48). Cook testified that, more days than not, she does not leave the house. (Tr. 48).

Cook testified that she had cataract surgery on both eyes, which resulted in complete improvement of the problem it was designed to address. (Tr. 48-49). She stated that she experiences auditory hallucinations most days. (Tr. 49). She also testified to experiencing random visual hallucinations happening at least monthly. (Tr. 50). Cook stated that medication had helped "somewhat" with the hallucinations. (Id.). She testified that, on occasion, her back would give out and she would have pain shooting down her left leg. (Tr. 51-52). She also stated that lifting her left arm caused her pain. (Tr. 52). Cook also testified to having headaches two to three times a week that would last half the day. (Tr. 54).

Cook testified that, in a typical day, she cleans and watches television. (Tr. 50). She stated that she smokes around five cigarettes a day. (Tr. 58).

Following Cook's testimony, the ALJ asked the vocational expert whether an individual of Cook's age and educational level who had no past relevant work and "[w]ho is capable of sedentary work, but she would require a sit/stand option at her discretion, could not be exposed to gas, dust, fumes or smoke, could remember and carry out only simple instructions and would be limited to having only occasional contact with others" would be able to perform the jobs of sorter, surveillance system monitor, and inspector. (Tr. 56-57). The vocational expert answered in the affirmative. (Tr. 57). The ALJ next asked the vocational expert to consider the same facts as that posed in the initial hypothetical with the exception that the hypothetical individual would be able to perform light work. (Tr. 66-67). The vocational expert testified that the same positions would be available to such a hypothetical individual. (Tr. 67).

G.    Administrative Decision

In assessing Cook's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits. See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled. Id. The ALJ found that Cook had not engaged in substantial gainful activity since August 8, 2008. (Tr. 28).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). In his original decision, the ALJ determined that Cook had the following severe impairments:

Post-traumatic stress disorder (PTSD), obesity, depression, diabetes, status post cataract of right eye, moderate stenosis at the C4-6 levels, status post right coronary vascular accident (stroke), and hypothyroidism.

(Tr. 169).  In his original decision, the ALJ also stated that Cook "suffers from chronic obstructive pulmonary disease (COPD) and hypertension, which have not been shown to severely and adversely affect her vocational capacity."  (Id.).  On remand, the ALJ determined that, in addition to those impairments listed above, Cook also had the additional severe impairment of anxiety.  (Tr. 28).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Cook did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 30).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments.  20 C.F.R. § 404.1545(a)(1).  In his original decision, the ALJ determined that:

> [Cook] has the residual functional capacity to perform sedentary work[11] as defined
> in 20 CFR 404.1567(a) and 416.967(a) except she would require a sit-stand option

---

[11] "Sedentary" work:

    involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
    docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves

at her discretion, cannot be exposed to gas, dust, fumes, or smoke, and could remember and carry out only simple instructions (this latter restriction is set forth to accommodate her mental impairments.)

(Tr. 175).  On remand, the ALJ found:

[Cook] has the residual functional capacity to perform light work[12] as defined in 20 CFR 404.1567(b) and 416.967(b) except she would have the restrictions set forth in the original decision.  In addition to those restrictions, I conclude she must have a job where she would have only occasional contact with others.

(Tr. 31) (footnotes omitted).  The ALJ determined that transferability of job skills was not an issue because Cook did not have past relevant work.  (Tr. 32).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ determined that, based upon her RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Cook can perform.  (Tr. 32-33).  Accordingly, the ALJ found that Cook was not disabled at any time from August 8, 2008, through November 15, 2013.  (Tr. 33).

---

sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

[12] "Light" work:

involves lifting no more than 12 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

## II.   STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.    ANALYSIS

A.    Weight of Medical Opinions

As an initial matter, Cook argues that the ALJ erred when he failed to follow the Appeals Council's instructions on remand.  (Docket #12 at 17-18).  On remand, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeal's Council's order."  20 C.F.R. § 404.977(b); see also Ellis v. Colvin, 29 F. Supp. 3d 288, 300 (W.D.N.Y. 2014) (holding that a failure to follow directions from the Appeals Council is legal error even where the Appeals Council affirms the ALJ's subsequent decision).  Here, the Appeals Council instructed the ALJ to reconsider Cook's physical and mental restrictions based on all the evidence.  (Tr. 185).  Cook asserts that the ALJ failed to heed this instruction when he gave the exact same weight to the opinions from the medical sources as that given in his first decision.  (Docket #12 at 17-18).  The Court disagrees.  There is nothing in the Appeals Council's instructions that precluded the ALJ from assigning the same weight to the opinions of the medical sources in his subsequent decision.  (See Tr. 185).  The ALJ's discussion of the weight given to Dr. Och's opinion, discussed infra, and his discussion of the record subsequent to the initial decision, (Tr. 29-30), reveal that the ALJ followed the Appeals Council's directive to reconsider the issue of RFC.

Cook also argues that the ALJ failed to properly weigh the opinions of her treating physicians, Dr. Och and Dr. Trister.  (Docket #12 at 16-23).  A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2). However, "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the

record, the requirement of 'controlling weight' does not apply." Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 U.S. App. LEXIS 14287, at *11-12 (1st Cir. June 9, 1994); see Leahy v. Raytheon Co., 315 F.3d 11, 21 (1st Cir. 2002) ("When other evidence sufficiently contradicts the view of a treating physician, that view appropriately may be rejected.").

In his initial decision of January 27, 2012, the ALJ afforded little weight to the opinions of Dr. Och and Dr. Trister. (Tr. 173). He reiterated this view in his opinion of November 15, 2013, stating, if anything, he was inclined to give no weight to the views of Dr. Och. (Tr. 30). The ALJ gave three reasons for discounting the opinions of the treating physicians. (Id.). I will address each of these reasons in turn.

First, the ALJ stated that the treating physicians' conclusion that Cook was disabled was not an appropriate medical opinion but, rather, an opinion reserved for the ALJ. (Tr. 173). The ultimate decision of whether a claimant is disabled is not a medical opinion but, rather, administrative in nature, and, therefore, is reserved to the Commissioner. 20 C.F.R. 404.1527(d)(1). As a result, "the opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion)." Foley v. Astrue, No. 09-10864-RGS, 2010 U.S. Dist. LEXIS 60174, at *25 (D. Mass. June 17, 2010) (citing Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 n.7 (1st Cir. 1988)). Hence, contrary to Cook's argument, the ALJ committed no error when he discounted the treating physicians' ultimate conclusion that Cook was disabled on this basis.

The ALJ also found that the treating physicians' opinions were "strikingly inconsistent" with the physicians' factual observations of Cook over the years. (Tr. 173) (emphasis in original). In fact, the ALJ noted that this was perhaps the most important factor in evaluating these opinions. (Id.). In his subsequent decision of November 15, 2013, the ALJ affirmed that his views of Dr.

Trister and Dr. Och were unchanged from those of his original opinion, stating that, if anything, he was inclined to give no weight to the views of Dr. Och as his observations about Cook since the decision of January 27, 2012 "are even more starkly in contrast with his 2013 conclusions regarding her mental status than was the case with his conclusions and observations from 2012." (Tr. 30) (footnote omitted).

The record contains several inconsistencies between Dr. Och's observations of Cook and his opinions on her condition.  On April 7, 2010, Cook had a follow-up visit with Dr. Och in which he found that her hallucinations were improved overall and that her depression was "under good control."   (Tr. 792).   However, a week later, on April 15, 2010, Dr. Och completed a Psychiatric/Psychological Impairment Questionnaire in which he concluded that Cook could not maintain even low stress employment and would likely be absent from work more than three times a month due to her impairments.  (Tr. 838-45).  This is in contrast to his finding, three weeks later, on May 11, 2010,  that Cook was "[d]oing well," stable on her medications, sleeping well, and had reduced auditory hallucinations.  (Tr. 791).  Likewise, on November 22, 2011, following Cook's return from Florida, Dr. Och noted that she was "[g]reatly improved," okay on her medications, and was "no longer psychotic." (Tr. 859).  On December 20, 2011, he observed that, except for a cold, Cook was otherwise okay and had no issues with her mediation.  (Id.).  Despite these noted improvements, less than two weeks later, Dr. Och adopted his April 2010 Questionnaire results, finding Cook even more limited in some activities and stating that she was incapable of maintaining even low-stress employment.  (Tr. 850-57).  Furthermore, on June 19, 2013, Dr. Och stated that the functional limitations he had found in the April 15, 2010 and January 2, 2012 Psychiatric/Psychological Impairment Questionnaires remained valid, despite finding on March 20, 2013 that Cook had improved on Latuda, which was working better than any of her previous

medications, and observing on June 12, 2013 that Cook was doing well and "[m]uch more stable" and had only "[v]ery rare" psychotic symptoms.  (Tr. 871-72, 881, 883).

Similarly, inconsistencies exist between Dr. Trister's observations of Cook and his conclusions.  On September 1, 2010, Dr. Trister noted that Cook's depression was stable, she suffered no side effects from her medication, and her hypothyroidism and hypertension were under control.  (Tr. 805).  These findings are in contrast to the Multiple Impairment Questionnaire he completed two-and-a-half months previously in which he stated that Cook was not a malingerer and was unable to work.  (Tr. 812-20).  On September 20, 2011, after Cook returned from Florida, Dr. Trister found that Cook's hypothyroidism and hypertension were controlled, her depression was stable, and her medications had been somewhat effective.  (Tr. 798).  These findings were reiterated on October 25, 2011.  (Tr. 860).  Nonetheless, on January 26, 2012, Dr. Trister stated that the Multiple Impairment Questionnaire completed on June 8, 2010, remained an accurate and valid representation of his opinion of Cook's ongoing condition.  (Tr. 863).

The inconsistencies outlined above provide substantial support for the ALJ's decision to discount the opinions of the treating physicians.  Although Dr. Och's notes could be interpreted as finding that, while Cook is greatly improved, she nevertheless remains unable to work because of her mental health conditions, this is not the only supportable reading of his notes.  The resolution of this conflict is for the ALJ.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  Because the ALJ's resolution of this conflict is supported by substantial evidence, "[I] must affirm . . . even if the record arguably could justify a different conclusion."  Id. I note that the ALJ's interpretation is bolstered by the findings of Dr. Campbell and Dr. O'Sullivan. (See Tr. 551-54, 564-67).

Finally, in affording little weight to the opinions of Dr. Och and Dr. Trister, the ALJ found that the physicians' opinions of extreme limitation and total disability were inconsistent with Cook's evaluation of herself. (Tr. 173). Specifically the ALJ noted that Cook referred to herself as feeling "OK" throughout the evidence, was able to walk six blocks from her home to the hearing, and was capable of moving to and from Florida recently. (Id.). In his April 15, 2010 Psychiatric/Psychological Impairment Questionnaire, Dr. Och found that Cook was markedly limited, defined as effectively precluded, in the ability to travel to unfamiliar places. (Tr. 841). This finding is in patent contrast to Cook's ability to move to Florida for eight months, during which she lived in a camper in three different locales across the state. (Tr. 90-91). Likewise, Cook's ability to walk almost a mile to the hearing, which she indicated took her about ten minutes, arguably conflicts with Dr. Trister's opinion that in an eight-hour work day, Cook could stand/walk for less than one hour and that her level of fatigue was severe, rated a nine out of ten. (Tr. 815). The ALJ's resolution of this conflict is supported by substantial evidence and, hence, must be accepted by the undersigned. See Rodriguez Pagan, 819 F.2d at 3.

Cook next asserts that the ALJ erred in his interpretation of Dr. Campbell's opinions, asserting that the opinions from Dr. Campbell do not conflict with those of Dr. Och. (Docket #12 at 21). Consistent with Dr. Och, Dr. Campbell found that Cook experienced considerable anxiety and had few interpersonal skills. (Tr. 554). However, unlike Dr. Och's finding of total disability, Dr. Campbell concluded that, in spite of these impairments, Cook did not have any major formal cognitive defects and was able to focus, concentrate, and learn new material in a minimally stressful environment. (Id.). The ALJ supportably gave Dr. Campbell's assessment "significant weight," finding it consistent with the factual observations of the treating physicians and with Cook's self-evaluations. (Tr. 173).

Cook also argues that the opinions of her treating physicians should have been given more weight than those of the non-examining doctors in light of her conditions.  (Docket #12 at 21-22). The ALJ assigned moderate weight to the opinions of the non-examining state evaluators to the extent they were consistent with his assessment of Cook's RFC.  (Tr. 173).  "It is well established in this circuit that an ALJ may accord substantial weight to the opinions of non-treating medical reviewers."  D.A. v. Colvin, No. 11-40216-TSH, 2013 U.S. Dist. LEXIS 140791, at *21 (D. Mass. Sept. 30, 2013) (citing Quintana v. Comm'r of Soc. Sec., 110 Fed. Appx. 142, 144 (1st Cir. 2004)). Indeed, "[a]n ALJ can assign more weight to non-examining medical reviewers even where these opinions contradict the opinion of treating physicians."  Id. (citing Arroyo v. Sec. of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)).  As discussed above, the ALJ supportably discounted the opinions of Dr. Och and Dr. Trister; thus, it was appropriate for him to accord greater weight to the non-examining physicians to the extent their opinions were consistent with the medical record.

Cook further argues that the ALJ should not have given any weight to Dr. O'Sullivan as he did not review any treatment records or reports from Dr. Och.  (Docket #12 at 22).  Dr. O'Sullivan completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique for Cook on November 20, 2009.  (Tr. 564-81).  While Dr. Och had been treating Cook since August 11, 2009, (Tr. 826), and had seen Cook on six occasions prior to Dr. O'Sullivan's opinion, (Tr. 831-35), it does not appear that Dr. O'Sullivan relied on Dr. Och's notes in completing his report.  (See Tr. 580).  The handwritten notes from Cook's appointments with Dr. Och during the relevant period are, in most part, illegible.  (See id.).  The portions that are legible reveal that Dr. Och consistently found Cook to be calm, cooperative, and organized with a lack of suicidal thoughts or delusions.  (Id.).  The notes do reveal that Cook suffered at times from hallucinations.

(Id.).  These findings do not necessitate any greater limitations than those opined to by Dr. O'Sullivan; thus any error, if any, which could be ascribed to the ALJ for relying on Dr. Sullivan's opinion is harmless.

Lastly, Cook argues that, even assuming the treating physician's opinions were not entitled to controlling weight, the ALJ erred by failing to consider all of the factors provided in 20 C.F.R. § 404.1527 as part of his evaluation of the doctors' opinions.  (Docket #12 at 23).  When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to actually give the opinion:  the length, nature, and extent of treatment and the frequency of the examination; supportability of the opinion by the evidence; consistency with the record; the specialization of the treating source; and any other relevant factors which support or contradict the opinion.   20 C.F.R. § 404.1527(c)(2)-(6); see Rodriguez Pagan, 819 F.2d at 3 (holding that ALJ was not required to assign treating physicians' opinions controlling weight because the opinions were based excessively on claimant's subjective complaints, rather than on objective medical findings).  The ALJ need not discuss each individual factor.  Healy v. Colvin, No. 12-30205-DJC, 2014 U.S. Dist. LEXIS 40940, at *41 (D. Mass. Mar. 27, 2014).  If the ALJ affords less weight to a treating physician's opinion after considering these factors, the court must uphold the decision so long as the ALJ's decision and reasoning are sufficiently clear.  Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008).  In discounting the opinions of Dr. Och and Dr. Trister, the ALJ focused on the consistency and supportability of their opinions with the record as a whole.  (Tr. 173).  However, in his decision, the ALJ outlined Cook's lengthy treatment history with both providers and noted their respective specialties.  (Tr. 169-72).  It is clear that he was aware of these factors and took them under consideration.

In sum, I find that substantial evidence supports the ALJ's decision to afford little weight to the opinion of Dr. Trister and little to no weight to the opinion of Dr. Och.  Contrary to Cook's arguments, I find that there was no error.

B.   Credibility Determination

Cook argues that the ALJ erred by failing to properly consider her subjective complaints, and that this error resulted in a flawed RFC.  (Docket #12 at 23-26).  The ALJ found that Cook's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Cook, but Cook's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  (Tr. 32).  In making this determination, the ALJ adhered to his original assessment of Cook's credibility in his decision of January 27, 2012.  (Tr. 30).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve the applicant."  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  If the ALJ finds that a claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors."  Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam).  Known as the "Avery factors," these descriptions must be carefully

considered by the ALJ before he declares the claimant not to be credible.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

The ALJ advanced three reasons, which touch on the Avery factors, for finding that Cook was not fully credible.

First, the ALJ found that Cook's symptoms improved with medication, stating:  "all of the symptoms from the claimant's impairments, according to her health care providers and the claimant herself, have improved with the use of medicines.  All of her health care providers have indicated, contrary to the claimant's testimony, that she suffers no significant adverse side effects from them."  (Tr. 172).  In finding Cook not credible, the ALJ also relied on the inconsistency between Cook's assertions with her physician's factual observations noting that "[t]he factual observations (as opposed to the conclusions of those doctors) consistently conclude that her various symptoms are under control adequate to allow her to engage in some [substantial gainful activity]."  (Id.) (emphasis in original).  An impairment that can be controlled by treatment is not disabling.  Belanger v. Apfel, 113 F. Supp. 2d 191, 196 (D. Mass. 2000).  Cook argues that there is no evidence that her symptoms or restrictions were controlled to a sufficient degree that would allow her to work within the limitations found by the ALJ.  (Docket #12 at 25).  As discussed above, however, the factual observations of Dr. Och and Dr. Trister indicate that Cook was doing well, her psychotic symptoms were diminishing to the point of being very rare, her depression was stable, she suffered no side effects from her medication, and her hypothyroidism and hypertension were under control.  (See Tr. 791-92, 798, 805, 859-60, 881).  Although Cook testified that Lorazepam, which she has taken since at least December 22, 2008, makes her drowsy, (Tr. 97-98, 104, 544), this testimony is inconsistent with the medical records.  Treatment notes from both Dr. Och and Dr. Trister consistently state that Cook suffered no side effects from her medications.

(Tr. 127, 603, 725, 786, 798, 805, 817, 843, 855, 859, 882, 884).   This evidence provides substantial support for the ALJ's credibility determination.

The last basis of the ALJ's credibility determination was Cook's failure to comply with medical advice.  (Tr. 172).  The ALJ noted that "[d]espite her respiratory impairment, and despite being advised to stop smoking, she continues to do so," causing him to "view her testimony with some caution."  (Id.).  Cook argues that there is no evidence in the record that her medical conditions are not as severe as she testified simply because of her continued smoking.  (Docket #12 at 26).  However, courts in this district have found that noncompliance with medical advice to cease smoking is a permissible basis on which to discount a claimant's credibility.  See Guenther v. Colvin, No. 15-30001-MGM, 2016 U.S. Dist. LEXIS 19120, at *10 (Feb. 17, 2016) (collecting cases); Sexton v. Barnhart, 247 F. Supp. 2d 15, 23 (D. Mass. 2003) (Neiman, M.J.) (upholding ALJ's credibility assessment, which relied upon, among other things, the fact that plaintiff continued to smoke despite asthma); but see Wilson v. Colvin, No. 12-40162-TSH, 2014 U.S. Dist. LEXIS 7794, at *25-27 (D. Mass. Jan. 22, 2014) (holding that ALJ improperly considered claimant's failure to quit smoking as cause to discount his back impairment where there was no evidence that quitting smoking would improve claimant's back pain and restore his ability to work).  Regardless, even if the ALJ erred in finding that Cook's continued smoking undermined her credibility, such error would be harmless as the ALJ's credibility determination is adequately supported by other record evidence.  See Bray v. Comm'r of SSA, 554 F.3d 1219, 1227 (9th Cir. 2009) (holding that even if ALJ erred in finding that claimant's smoking undermined her credibility, such error was harmless where ALJ presented four other independent bases for discounting claimant's testimony that each found ample support in the record); Wilson, 2014 U.S. Dist. LEXIS 7794, at *27 (holding that, while ALJ's credibility determination was flawed as it

took into account claimant's continued smoking against medical advice, such error was harmless as ALJ's determination of claimant's credibility was otherwise adequately supported).

In addition to these reasons, the ALJ also stated that his observations of Cook's demeanor factored into his credibility determination.  (Tr. 173).  Cook asserts that this was inappropriate, arguing that the ALJ's lay observation of Cook at two brief hearings is hardly significant evidence of her functioning.  (Docket #12 at 26).  This Court disagrees and finds that the ALJ properly considered Cook's demeanor during the hearing as a factor in his credibility assessment, particularly in light of Cook's testimony that she had constant pain in her shoulder, neck, and back.  See SSR 96-7p ("In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but should consider any personal observations in the overall evaluation of the credibility of the individual's statements."); Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (stating that it was "particularly appropriate" to consider claimant's demeanor in making credibility assessment where claimant testified that she constantly suffered pain rated at an eight out of ten).  The Court notes that Cook's demeanor was only one factor that the ALJ considered among others in assessing her credibility.  Cf. Miller v. Sullivan, 953 F.2d 417, 422 (8th Cir. 1992) ("Although the demeanor of a claimant may be noticed by an ALJ, the ALJ cannot reject a claimant's credibility on account of failure to 'sit and squirm' during a hearing.").

C.    Vocational Expert Testimony

Cook argues that the ALJ's finding at step five is inadequately supported by the evidence. (Docket #12 at 26-27).

"The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis.  In order to be substantial

evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations." Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011) (internal citation omitted); see Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities.  To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.").  Here, the ALJ presented to the vocational expert a hypothetical individual of Cook's age, education, and work experience with a RFC for light work requiring a sit/stand option at her discretion, no exposure to gas, dust, fumes, or smoke, with the ability to remember and carry out only simple instructions, and only occasional exposure to others.  (Tr. 56-57, 66-67).  Based on this hypothetical, the vocational expert testified that the hypothetical individual could perform the positions of sorter, surveillance system monitor, and inspector.  (Tr. 57, 67).

Cook contends that the ALJ failed to accurately describe all of the mental limitations he found for Cook in his hypothetical to the vocational expert.  (Docket #12 at 27).  In his opinion of November 15, 2013, the ALJ stated that Cook had mild to moderate difficulties in social functioning and mild to moderate difficulties with regard to concentration, persistence, or pace. (Tr. 31).  In his hypothetical to the vocational expert, the ALJ limited Cook to remember and carry out only simple instructions and to only occasional contact with others.  (Tr. 56-57).  Cook argues that the ALJ failed to include any restrictions accounting for moderate limitations in persistence or pace in the work environment, and that the limitation to only occasional contact with others

does not accurately account for the types of interactions that Cook can engage in with others. (Docket #12 at 27).

In the Mental Residual Functional Capacity Assessment form assessing Cook, Dr. O'Sullivan stated that Cook's ability to maintain attention and concentration for extended periods was moderately limited.  (Tr. 564).  Dr. O'Sullivan also stated that Cook's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited.  (Tr. 564-65).  Additionally, Dr. O'Sullivan found that Cook's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited as was her ability to work in coordination with, or in proximity to, others without being distracted by them.  (Id.).  In light of these limitations, Dr. O'Sullivan opined that Cook could learn and remember simple routine and somewhat detailed instructions.  (Tr. 566).  He further opined that, with respect to her limitations regarding concentration, persistence, and pace, while Cook may need occasional brief breaks to manage anxiety, simple routine tasks could be done at an average pace over a regular full-time routine and that Cook would do best in uncrowded settings to minimize distraction.  (Id.).  With respect to her limitations regarding social interaction, Dr. O'Sullivan found that, although Cook may tend to be withdrawn from co-workers, overall, she could be socially effective.  (Id.).

"A finding of moderate limitations in maintaining concentration, persistence, or pace, does not necessarily preclude the performance of unskilled work."  Perry v. Astrue, No. 11-40215-TSH, 2014 U.S. Dist. LEXIS 139575, at * 15 (D. Mass. Sept. 30, 2014). "When an acceptable medical source provides an opinion that despite moderate limitations in concentration, persistence, or pace the claimant is able to do unskilled work or simple routine work, no further restriction in residual

functional capacity is necessary." <u>Mudgett v. Colvin</u>, No. 14-cv-143-JD, 2014 U.S. Dist. LEXIS 170099, at *8 (D.N.H. Dec. 9, 2014), (citing <u>Falcon-Cartagena v. Comm'r of Soc. Sec.</u>, 21 F. App'x 11, 14 (1st Cir. 2001) (concluding that a moderate limitation in nonexertional functioning required for unskilled work does "not affect, more than marginally, the relevant occupational base")). While Dr. O'Sullivan found that Cook's ability to maintain attention and concentration for extended periods was moderately limited, he determined that Cook could perform simple routine tasks at an average pace over a regular full-time routine. (Tr. 564-66). The ALJ adequately accounted for the effects of Cook's limitations with respect to concentration, persistence, and pace as opined by Dr. O'Sullivan in the hypothetical that he posed to the vocational expert, limiting Cook to remember and carry out only simple instructions. The ALJ also appropriately accounted for the effects of Cook's limitations with respect to social functioning. Dr. O'Sullivan determined that, although Cook might be withdrawn from her coworkers, she could be socially effective. (Tr. 566). The ALJ's hypothetical to the vocational expert adequately accounted for this, limiting Cook to only occasional exposure to others. Hence, remand is not required.

IV.     CONCLUSION

        For the foregoing reasons, Cook's Motion to Remand (Docket #11) is DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #21) is ALLOWED.


                                        /S/ David H. Hennessy
                                        David H. Hennessy
                                        UNITED STATES MAGISTRATE JUDGE